IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| JULIE TUMMONS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:12-CV-03076- NKL |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Julie Tummons seeks review of the Administrative Law Judge ("ALJ")'s decision denying her applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*. [Doc. # 3]. For the reasons set forth below, the decision of the ALJ is REVERSED and the case is remanded with the instruction to award benefits to Tummons.

**I.     Background[1]**

   **A.     Mental Health Records**

On March 28, 2006, Tummons saw Joyce Everson, Psy.D., at Burrell Behavioral Health ("Burrell"). Tummons primarily complained about having difficulty controlling her anger and Dr. Everson set up a treatment plan focused on anger management. Dr.

---

[1] The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

1

Everson diagnosed Tummons with intermittent explosive disorder and assessed a Global Assessment of Functioning ("GAF") score of 55. Dr. Everson saw Tummons again on April 4, 2006, to work on anger management. Dr. Everson noted that Tummons was very attentive and took notes. In a note dated April 24, 2006, Dr. Everson indicated that Tummons reported getting angry and cutting herself and having difficulty maintaining awareness when she gets angry.

On May 2, 2006, Tummons saw Virginia Jones, R.P.N., at Burrell. Tummons again reported cutting herself and stated that when she gets mad she blacks out and later cannot remember what she has done. Tummons also reported having thoughts of hurting others and experiencing paranoia. Ms. Jones noted that Tummons' thought processes were clear and coherent, but not always goal oriented and sometimes Ms. Jones had to redirect Tummons' racing mind. Ms. Jones described Tummons as alert and orientated, but noted that Tummons sometimes had difficulty staying on track during the office visit. Ms. Jones indicated that Tummons' judgment/insight was poor, her affect was affable but blunted at times, and her speech was pressured. Tummons also reported anxiety and Ms. Jones noted that Tummons had difficulty sitting still during the examination and kept having to get up and move around. Ms. Jones diagnosed Tummons with bipolar disorder and intermittent explosive disorder. Ms. Jones also assessed a GAF score of 50, increased one of Tummons' medications, and continued several others. Tummons also gave Ms. Jones disability evaluation forms, but Ms. Jones stated that she could not fill out the forms at that time because she did not have enough information.

2

Over the next fourteen months, Ms. Jones and Tummons met for treatment six more times. During each visit, Ms. Jones noted that Tummons had problems with concentration, poor or poor to fair judgment/insight, and a GAF score of 50. On November 29, 2006, Ms. Jones added a diagnosis for personality disorder NOS with some obsessive-compulsive traits. But Tummons also showed some improvement over this period and Ms. Jones repeatedly indicated that Tummons' thought processes were clear, coherent, and goal directed. At the last visit on July 9, 2007, Ms. Jones reported that Tummons' bipolar disorder remained improved and Ms. Jones described Tummons' intermittent explosive disorder as stable.

After Ms. Jones left Burrell, Tummons was referred to Peggy Vecoli, R.P.N., at Burrell. During Ms. Vecoli's first examination of Tummons on September 13, 2007, Ms. Vecoli noted that Tummons was hypomanic and very exaggerated with her affect, and that Tummons' speech was somewhat pressured and very animated. Tummons reported potential hallucinations, including hearing noises and seeing people walk by who possibly were not there. Ms. Vecoli indicated that Tummons' judgment/insight was variable depending on her manic mood, but otherwise indicated that Tummons was organized and alert and denied any problems with concentration or attention. Ms. Vecoli diagnosed Tummons with: bipolar I disorder, most recent episode mixed, moderate, with psychotic features; intermittent explosive disorder; and personality disorder, NOS. Ms. Vecoli also assessed a GAF score of 50.

Tummons saw Ms. Vecoli six more times between September 2007 and August 2008. On October 9, 2007, Ms. Vecoli adjusted Tummons' diagnoses to: bipolar I

3

disorder, most recent episode manic; panic disorder with agoraphobia; and obsessive compulsive disorder. On May 5, 2008, Ms. Vecoli noted that she reviewed disability paperwork with Tummons, signed the forms, and returned them to Tummons. Specifically, Ms. Vecoli completed a Medical Source Statement—Mental ("MSSM"), indicating that Tummons was markedly limited in five areas of functioning and extremely limited in ten areas. On the check-list form, Ms. Vecoli included handwritten explanations for most of the limitations she assessed. The treatment relationship between Ms. Vecoli and Tummons ended in November 2008, when Ms. Vecoli passed away.

Between September 29, 2007 and July 30, 2010, Tummons also received mental health treatment at Family Medical Walk-In Clinic ("Family Medical"). At Family Medical, Tummons was treated by William Baird, D.O., and Jeanene Kennett, APRN, FNP-BC, primarily for bipolar disorder. Tummons saw Dr. Baird and/or Ms. Kennett on many occasions during this period.

On September 3, 2008, Dr. Baird completed an MSSM for Tummons. In this MSSM, Dr. Baird indicated that Tummons was moderately impaired in nine areas of functioning, markedly impaired in four, including the ability to complete a normal workday and workweek, and not significantly impaired in the other seven. On June 5, 2009, Dr. Baird completed a second MSSM for Tummons. In this MSSM, Dr. Baird indicated that Tummons was moderately impaired in every area of functioning. On December 4, 2009, Ms. Kennett also completed a MSSM for Tummons. Ms. Kennett's MSSM indicated that Tummons was not significantly limited in four areas of functioning and moderately limited in the other sixteen areas.

On October 20, 2008, Frances Anderson, Psy.D., performed a consultative psychological evaluation of Tummons. Dr. Anderson diagnosed Tummons with bipolar disorder NOS, obsessive compulsive disorder, and personality disorder NOS with borderline avoidant, antisocial traits. Dr. Anderson also assessed a GAF score of 55-60. Generally, Dr. Anderson described Tummons' functional abilities as adequate.

On October 23, 2008, Kenneth Burstin, Ph.D., reviewed Tummons' record and performed a Psychiatric Review Technique ("PRT"). Dr. Burstin's PRT indicated that Tummons suffered from bipolar disorder NOS, anxiety disorder, and personality disorder NOS. Dr. Burstin concluded that Tummons was moderately limited in activities of daily living and maintaining social functioning, and mildly limited in maintaining concentration, persistence, or pace. Dr. Burstin also noted that Tummons' interpersonal limitations might be more than suggested by Dr. Anderson, but that the pervasive and marked limitations alleged by Tummons were not entirely consistent with observation or even Tummons' own statements to Dr. Anderson. Dr. Burstin also completed a Mental Residual Functional Capacity Assessment ("MRFCA"), which indicated that Tummons was markedly limited in her ability to interact appropriately with the general public. The MFRFCA indicated that Tummons was moderately limited in four other areas of functioning and not significantly limited in the remaining fifteen areas.

### B. Physical Health Records

On November 18, 2003, Tummons began receiving treatment from Keith Mainprize, D.C., for pain in her back and neck that started after a motor vehicle accident. Between August 22, 2003 and July 13, 2006, Tummons saw Dr. Mainprize forty-two

5

times for spasms and tenderness in her neck and back. On June 30, 2004, Dr. Mainprize diagnosed Tummons with myofascial pain syndrome. On July 13, 2006, Dr. Mainprize diagnosed Tummons with chronic fibromyalgia, acute exacerbations of myofascial/myositis, and myospasms.

Dr. Mainprize completed a Medical Source Statement—Physical ("MSSP") for Tummons on September 5, 2008. This MSSP indicated that Tummons could: lift five pounds frequently and ten pounds occasionally; stand/walk continuously for fifteen minutes at a time and less than one hour total per day; and sit continuously for thirty minutes at a time and less than one hour per day. Dr. Mainprize also wrote that Tummons' hip, back, and neck pain limited her ability to push and pull.

Tummons also received treatment for her low back pain and poly-arthralgia from Dr. Baird and Ms. Kennett at Family Medical. Between September 29, 2006 and July 30, 2010, Tummons was treated at Family Medical for these conditions on at least thirteen occasions.

On September 5, 2009, Dr. Baird completed an MSSP for Tummons. This MSSP indicated that Tummons could: lift less than five pounds frequently and less than ten pounds occasionally; stand/walk continuously for less than fifteen minutes at a time and less than one hour total per day; and sit continuously for less than fifteen minutes at a time and less than one hour total per day. In addition, Dr. Baird indicated that Tummons could not push or pull due to chronic pain and that she could never climb, balance, stoop, kneel, crouch, crawl, or reach. Dr. Baird also wrote that Tummons would need to lie

6

down to relieve pain hourly during an eight hour shift and that her medications affect her concentration.

Ms. Kennett also completed an MSSP for Tummons on December 4, 2009. This MSSP indicated limitations in lifting, standing, walking, and sitting identical with those contained in Dr. Baird's MSSP. Ms. Kennett wrote that Tummons' ability to push/pull was limited due to weight limitations. This MSSP indicated that Tummons could never climb, kneel, crouch, or crawl, and that she could occasionally balance, stoop, and reach. Ms. Kennett also wrote that Tummons would need to lie down for fifteen minutes to relieve pain every fifteen to thirty minutes during an eight hour workday and that Tummons' medications affected her concentration, persistence, or pace.

On May 4, 2010, Jeffrey Woodward, M.D., performed a consultative examination of Tummons. Dr. Woodward assessed: cervicalgia with full cervical spine motion and no radiculopathy; chronic L4-5 lumbar pain with radicular symptoms but without objective neurologic deficits; right posterior elbow post-traumatic pain with very mild extension and motion restriction; left knee pain without acute inflammation or instability; chronic mild to moderate distal peripheral edema.

Based on this examination, Dr. Woodward completed an MSSP for Tummons. This MSSP indicated that Tummons could: lift and carry up to twenty pounds continuously but never more; sit for four hours, stand for one hour, and walk for one hour without interruption; sit for six hours, stand for two hours, and walk for two hours in an eight hour day; frequently reach overhead, and continuously reach, handle, finger, feel

7

and push/pull; never climb ladders or scaffolds, balance, kneel, or crawl, but occasionally climb stairs and ramps, stop, and crouch.

### C. Administrative Hearing Testimony

#### 1. Initial Hearing

At the first administrative hearing on March 15, 2010, Tummons testified that she was five feet, five inches tall and weighed three hundred pounds. She stated that she has edema in both of her legs which causes them to swell up every day. This swelling causes pain and Tummons reported needing to elevate her legs above her heart for about six hours each day to reduce the swelling. She testified that she has pain in her back, arms, and legs due to arthritis and that her blood work returned a 9 on a scale of 12 for rheumatoid arthritis. She reported that the constant pain in her back made her lie down to alleviate pain for a majority of each day. She also indicated that her pain medications make her drowsy. Tummons estimated that she could stand ten to fifteen minutes on a flat, hard surface, sit for an hour in a hard straight backed chair, and lift no more than five pounds.

Tummons also testified that she lives in a house with her sixty year old mother, sixteen year old son, and ten year old daughter. She reported that her mother does all of the cooking and cleaning around the house, except Tummons sometimes prepares light easy meals and will occasionally do very small loads of laundry. Tummons drives, although it sometimes makes her anxious. Tummons used to work part time, from noon to four o'clock, five days a week, as a clerk in a video store, until the store closed in October 2009.

Tummons also testified about her mental health problems. She stated that she was easily angered and had a history of having problems with coworkers. She recounted an incident where she became irate for no reason with a woman at Wal-Mart. Regarding her bipolar disorder, Tummons testified that she has more manic days than depressed. She estimated she is manic at least three days a week and is not able to be around people on those days.

At this hearing, Dr. Cathy Hodgson testified as a Vocational Expert ("VE"). According to Dr. Hodgson, an individual with the physical limitations indicated in Dr. Mainprize's MSSP would not be able to perform any work. Similarly, Dr. Hodgson testified that an individual with the limitations indicated in Dr. Baird's MSSP and Ms. Kennett's MSSP would not be able to perform any work. Finally, Dr. Hodgson testified that an individual with the mental limitations indicated in the MSSMs completed by Ms. Vecoli, Dr. Baird, and Ms. Kennett would not be able to perform any work, even if each of those opinions stood alone.

At the end of the hearing, the ALJ ordered an additional consultative examination, which Dr. Woodward performed on May 4, 2010, as described above.

### 2. Additional Vocational Interrogatory

On June 17, 2010, Dr. Hodgson, at the request of the ALJ, completed a vocational interrogatory. Item number seven of the interrogatory described the residual functional capacity ("RFC") of four hypothetical individuals, with the first reflecting the limitations assessed by Dr. Woodward. In item number eight of the interrogatory, Dr. Hodgson indicated that an individual described in any of the four hypothetical RFCs presented

9

would not be able to perform any unskilled occupations with jobs that exist in the national economy.

### 3. Supplemental Hearing

At the next administrative hearing, Tummons testified about changes in her condition. She stated that her medications had changed, which caused the swelling in her legs to increase to the point where she was unable to wear shoes ninety percent of the time. She also reported needing help bathing and dressing because of the swelling.

Terry Crawford testified as the VE at this hearing. Ms. Crawford testified that a person with the physical limitations indicated by Dr. Woodward and the mental limitations indicated by Dr. Burstin would be able to perform sedentary, unskilled work. According to Ms. Crawford, jobs matching this description existed in substantial numbers in the national economy and Missouri. Ms. Crawford also testified that a person with the limitations indicated by Ms. Vecoli, Dr. Baird, and Ms. Kennett would not be able to perform any work.

The ALJ determined that Tummons had the RFC to perform a wide range of sedentary to light work. Based on the testimony of Ms. Crawford, the ALJ found that Tummons could not perform any of her past relevant work, but that she was capable of other work that exists in significant numbers in the national economy.

## II. Discussion

### A. Standard of Review

The Court will affirm the ALJ's decision denying benefits if it is supported by substantial evidence in the record as a whole. *Finch v. Astrue*, 547 F.3d 933, 935 (8th

10

Cir. 2008). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). The Court must consider the evidence that supports the decision as well as the evidence contrary to it. *Finch*, 547 F.3d at 935. An administrative decision will not be reversed, however, simply because the Court might have reached a different conclusion. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011). If, after reviewing the evidence, it is possible to reach two inconsistent positions and one of those positions represents the ALJ's findings, the Court must affirm the decision. *Id.*; *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) ("Reversal is not warranted, however, merely because substantial evidence would have supported an opposite decision." (quotation omitted)).

### A. The Omitted Vocational Interrogatory

Tummons argues that the ALJ committed reversible error by not addressing the vocational interrogatory completed by Dr. Hodgson when the ALJ concluded that Tummons was not disabled at step five of the disability analysis. The ALJ must follow a five-step analysis to determine whether a claimant is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). At step five, the burden shifts to the Commissioner to prove "first that the claimant retains the RFC to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Where the claimant has non-exertional impairments, the Commissioner must rely on VE testimony to meet this burden. *Pearsall*, 274 F.3d at 1219.

11

After the first administrative hearing, the ALJ decided to order an additional, consultative examination. [Tr. 57-58]. After Tummons was examined by Dr. Woodward, the ALJ sent a vocational interrogatory to Dr. Hodgson, the vocational expert who testified at Tummons' first administrative hearing. [Tr. 248]. In the interrogatory, the ALJ proposed four hypothetical RFCs, one of which is nearly identical to the RFC described in the ALJ's decision. *Compare* [Tr. 16], *with* [Tr. 250]. Dr. Hodgson indicated that the individual described in these hypotheticals could not perform any unskilled occupations with jobs that exist in the national economy. [Tr. 254]. Nonetheless, in concluding that Tummons was not disabled, the ALJ relied on the testimony of Ms. Crawford, the vocational expert at Tummons' second administrative hearing, without addressing the opinion of Dr. Hodgson. [Tr. 21, 67].

Considering the burden was on the Commissioner at this stage of the disability determination, the ALJ's decision at step five is not supported by substantial evidence. The Commissioner argues that the opinion offered by Dr. Hodgson is irrelevant, because the ALJ's decision is still supported by the testimony of Ms. Crawford. But the testimony of one expert is not substantial evidence where another, equally qualified expert opined that a person with this RFC would be disabled and the ALJ provided no explanation for rejecting this evidence. Where probative evidence that conflicts with the ALJ's finding is proffered but not addressed, the Court cannot "determine whether any such rejection is based on substantial evidence." *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995). As the court noted in *Jones*, "Initial determinations of fact and credibility are for the ALJ, and must be set out in the decision, . . . ; we cannot speculate whether or

12

Case 6:12-cv-03076-NKL   Document 13   Filed 12/10/12   Page 12 of 20

why an ALJ rejected certain evidence." *Id.* (citation omitted). Consequently, even if the ALJ "may have considered and for valid reasons rejected" the opinion of Dr. Hodgson, the Court cannot speculate on this point and at the very least remand would be "necessary to fill this void in the record." *See id.*

### B. Weighing the Medical Opinions

Reversal and an immediate award of benefits is more appropriate, however, because the medical evidence overwhelmingly supports a disability finding. The ALJ's decision did not properly weigh the various medical opinions, especially the opinions of Tummons' treating physician, Dr. Baird. "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). A treating source's opinion must be given controlling weight if it is well-supported by medically acceptable diagnostic techniques and not inconsistent with the other substantial evidence in the record. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *see also Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). Because the record must be evaluated as a whole, however, "[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Medhaug v. Astrue*, 578 F.3d 805, 815 (8th Cir. 2009) (quoting *Goff*, 421 F.3d at 790). In any case, the ALJ must provide good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2); *see also Brown v. Astrue*, 611 F.3d 941, 951-52 (8th Cir. 2010).

13

The ALJ provided the following reasons for rejecting the MSSMs provided by Tummons' treating physician, Dr. Baird:

> As to the opinion of Dr. Baird, the Administrative Law Judge initially notes that Dr. Baird is a family practitioner in a walk-in clinic and his opinion appears to be based solely on the claimant's subjective complaints. In fact, Dr. Baird reported on July 30, 2010 that the claimant was "doing well" on Seroquel, having replaced Haldol with that medication a month before, and was "stable" on the current regime . . . .

[Tr. 19] (citation omitted). The ALJ discounted the opinion of Ms. Kennett for similar reasons, noting that she was "a family nurse practitioner in a walk-in clinic, not a mental health professional, . . . ." [Tr. 19]. Regarding Ms. Vecoli, the ALJ acknowledged that she was a mental health professional, but nonetheless rejected her opinion because it appeared "to have been based solely on the claimant's subjective complaints." [Tr. 20]. The ALJ also gave little weight to the opinion of Dr. Mainprize because he was "a chiropractor and had not seen the claimant for several years at the time he completed the [MSSP]." [Tr. 20]. As a result, the ALJ gave greater weight to the consultative opinions of Dr. Woodward, Dr. Anderson, and Dr. Burstin. [Tr. 19-20].

The Commissioner is correct that a medical source's specialty, or lack thereof, is one factor that must be considered in weighing the medical opinions of record. *See Brown*, 611 F.3d at 953. But *Brown* involved a conflict between two treating sources, one of whom was a specialist. *Id*. When two medical sources each maintained a treatment relationship with the claimant, the ALJ does not err in deferring to the opinion of the specialist. But specialty is only one of six factors the ALJ is required to consider when weighing medical opinions. *See* 20 C.F.R. 404.1527(c). A medical source's

14

specialty must also be weighed against "the length of the treatment relationship and the frequency of examinations." *Brown*, 611 F.3d at 951 (quotation omitted).

While Dr. Baird is not a specialist, he is still qualified to diagnose and treat psychiatric disorders and he had the advantage of treating Tummons on at least eighteen occasions between September 29, 2006 and September 3, 2008. [Tr. 334, 341, 350, 354, 358, 360, 390, 393, 399, 523, 526, 529, 532, 535, 538, 541, 550, 553, 556]. Similarly, Tummons' chiropractor, Dr. Mainprize, treated Tummons on forty-two occasions between November 18, 2003 and July 13, 2006. [Tr. 258-74]. By contrast, Dr. Burstin never examined Tummons and Dr. Anderson and Dr. Woodward each saw her only once. "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *see also Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) ("[T]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." (quotation omitted)); *Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) ("We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision."). Reliance on a one-time examination is particularly suspect when the claimant suffers from a psychological disorder, as "one characteristic of mental illness is the presence of occasional symptom-free periods," *Brown*, 611 F.3d at 954 (quoting *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996)).

15

Furthermore, the ALJ failed to address the consistency between the opinion of Dr. Baird and the opinions of Dr. Mainprize, Ms. Vecoli, and Ms. Kennett.  But the consistency of a medical source's opinion with the other medical evidence of record is another factor the ALJ is required to consider when weighing medical opinions.  20 C.F.R. 404.1527(c)(3).  In addition, the notion that a one-time consultative examination does not constitute substantial evidence "is especially true when the consultative physician is the only examining doctor to contradict the treating physician."  *Cox*, 345 F.3d at 610.  While the opinions of Dr. Mainprize, Ms. Kennett, and Ms. Vecoli are somewhat diminished because none qualifies as an "acceptable medical source," they do each qualify as "other sources" under 20 C.F.R. 404.1513(d)(1).

This type of evidence may be used "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to work."  20 C.F.R. 414.1513(d); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003); *see also* SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006) ( ([M]edical sources who are not 'acceptable medical sources,' . . . have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources, . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.").  Yet the ALJ in this case discussed the opinions of Dr. Mainprize, Ms. Vecoli, and Ms. Kennett individually and separately, without any reference to their consistency with the opinion of Dr. Baird.  *See* [Tr. 19-20].

16

The Commissioner argues that the consistency between the opinions of Dr. Baird and Ms. Kennett actually supported the ALJ's decision to reject Ms. Kennett's opinion. According to the Commissioner, Ms. Kennett's opinion was entitled to little weight because the ALJ had already rejected the opinion of her supervisor, Dr. Baird, in favor of the opinion of Dr. Anderson. But this argument is contradicted by the Eight Circuit's decision in *Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003).

In *Shontos*, the claimant was primarily treated by an acceptable medical source and two practitioners who qualified as "other sources." *Shontos*, 328 F.3d at 426. The court noted that these practitioners took a "team approach" to the claimant's treatment, and that their combined opinions "reflected clinical judgments of professionals who had interacted with and observed [the claimant] over time." *Id.* Due to the consistency of these opinions, the court found that they were entitled to greater weight than the opinions of the non-treating sources in the record, even though the record was "deficient in documentation to support their opinions." *Id.* at 426-27. Thus, the opinions of Dr. Baird and Ms. Kennett were entitled to greater weight, not less, due to their consistency.

In addition, one of the sources in *Shontos* only saw the claimant "intermittently . . . for the purpose of prescribing psychiatric medication." *Id.* at 426. This opinion was nonetheless accorded substantial weight as part of the body of opinions produced by the treatment team. *Id.* This contradicts the ALJ's conclusion that Ms. Kennett's opinion was entitled to little weight because it appeared "to be based solely on her limited experience in management of the claimant's medication." [Tr. 19].

17

Case 6:12-cv-03076-NKL   Document 13   Filed 12/10/12   Page 17 of 20

The Commissioner argues that *Lacroix v. Barnhart*, 465 F.3d 881 (8th Cir. 2006), supports the ALJ's decision. But *Lacroix* is inapposite because that decision was based on the lack of any acceptable medical source's participation in the claimant's treatment. *Lacroix*, 465 F.3d at 886 ("This case is distinguishable from *Shontos*, however, in one critical aspect: the treatment team in *Shontos* included a psychologist whose participation in the claimant's care gave the entire treatment team treating-source status. . . . In contrast, the record in this case does not contain a report by an acceptable medical source . . . ."). The active participation of Dr. Baird in Tummons' treatment thus makes this case more analogous to *Shontos* than *Lacroix*.

Finally, the ALJ improperly inferred that the opinions of Dr. Baird and Ms. Vecoli were based on Tummons' subjective complaints. Each of these sources maintained a significant treatment relationship with Tummons, and they endorsed their MSSMs as reflecting their respective medical opinions. *See* [Tr. 294, 480, 448]. The ALJ acknowledged that Ms. Vecoli was a mental health profession, [Tr. 20], and Ms. Vecoli even included handwritten explanations for many of the limitations she reported, which referenced Tummons' agoraphobia and anxiety. [Tr. 293-94]. References to specific psychological disorders are much more akin to medical diagnoses than Tummons' subjective complaints. The Commissioner argues that it can be inferred that Ms. Vecoli's MSSM was based on Tummons' subjective complaints because Ms. Vecoli wrote that she "reviewed" the paperwork with Tummons. But as the Eight Circuit reiterated in *Shontos*, "an administrative law judge may not draw upon his own inferences from medical reports." *Shontos*, 328 F.3d at 427 (quotation and alteration omitted). In

18

addition, when Dr. Baird completed his first MSSM, he noted that he was unable to complete an MSSP at that time. [Tr. 448]. This suggests that Dr. Baird was not willing to complete these forms without evidence beyond Tummons' subjective complaints.

The ALJ did cite one apparent inconsistency in Dr. Baird's treatment notes to support discounting his MSSMs, but this only reveals an additional problem with this decision. The ALJ noted that on July 30, 2010, Dr. Baird reported that Tummons was "doing well" on Seroquel and was "stable" on the current regime. [Tr. 19]. When "an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009). At the same time, however, "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." *Hutsell v. Massanari*, 259 F.3d 707, 712-13 (8th Cir. 2001) (noting that " 'doing well' as a chronic schizophrenic is not inconsistent with a finding of disability.").

Similarly, in *Shontos*, the ALJ cited the fact that the claimant "did much better" when she took her medication as a reason to discount the opinion of her treating doctor. *Shontos*, 328 F.3d at 427. The court rejected this conclusion as "an inference on the part of the ALJ," because no medical source indicated that the claimant's improvement with medication negated her doctor's opinion about her RFC. *Id.* Likewise, in this case, Dr. Baird did not conclude that because Tummons was, in relative terms, "doing well" and "stable" that his opinion about her RFC had changed. Consequently, the ALJ's inference on this point does not constitute substantial evidence.

Finally, reversal with an immediate award of benefits is appropriate because the medical evidence overwhelmingly supports a disability finding. *See Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (noting that an immediate finding of disability is appropriate where "the record overwhelmingly supports such a finding." (quotation omitted)). The MSSM completed by Ms. Vecoli based on Tummons' extensive mental health treatment with Dr. Everson, Ms. Jones, and Ms. Vecoli at Burrell was entitled to significant weight. In addition, Dr. Baird, Tummons' treating physician, and Ms. Kennett at Family Medical provided similarly restrictive MSSMs based on their lengthy treatment relationship with Tummons. In short, every treating source who maintained a longitudinal relationship with Tummons concluded that her mental impairments limited her functional capacity to an extent that compels a disability finding. On this record, remand could serve no useful purpose and "would merely delay receipt of benefits," *Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991).

### III. Conclusion

For the reasons set forth above, the ALJ's decision is REVERSED and the case is remanded with the instruction to award benefits to Tummons.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: December 10, 2012  
Jefferson City, Missouri